IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DeLAWRENCE A. KING,**                             Case Number 1:12 CV 2000

    Petitioner,                                      Judge Patricia A. Gaughan

    v.                                              Magistrate Judge James R. Knepp II

**DONALD MORGAN**, Warden,

    Respondent.                                      REPORT AND RECOMMENDATION

### INTRODUCTION

*Pro se* Petitioner DeLawrence A. King ("Petitioner"), a prisoner in state custody, filed a

petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 1) with attached memoranda

(Docs. 1-1, 1-2). Respondent, Warden Donald Morgan, filed an answer (Doc. 4) with supplemental

exhibits (Docs. 4-1– 4-29). Petitioner filed a reply (Doc. 5) and, with leave, an amended reply (Doc.

23) with supplemental exhibits (Doc. 23-1). Respondent filed, with leave, an amended answer (Doc.

29) with supplemental exhibits (Docs. 29-1 – 29-4). Petitioner filed a "second amended" reply (Doc.

30) with supplemental exhibits (Doc. 30-1 – 30-3). The district court has jurisdiction over this

petition under 28 U.S.C. § 2254(a). This matter has been referred to the undersigned for a Report

and Recommendation pursuant to Local Rule 72.2(b)(2). (Non-document entry dated January 4,

2016).[1] Following review and for the reasons stated below, the undersigned recommends the Petition

be denied.

---

[1] This case was transferred to the undersigned from Magistrate Judge Vernelis K. Armstrong.

## FACTUAL BACKGROUND

For purposes of federal habeas corpus review of state-court decisions, findings of fact made by the state court are presumed correct and can be contravened only if the habeas petitioner shows, by clear and convincing evidence, those factual findings are erroneous. 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial-court record. *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). In this case, Ohio's Ninth District Court of Appeals set forth the following findings of fact:

{¶ 22} The State presented testimony from 12 witnesses. Charles Mason testified that in 2003 he lived in Wilkes Villa with his family. He explained that on October 26, 2003, as his family was moving out of their apartment, he heard his fiancé arguing with King about a light bulb. When his fiancé attempted to call the police, King pulled out a gun. Mason later encountered King, and King accused Mason of owing him money and calling the police. Mason denied calling the police. King then left and Mason heard gunfire. Mason identified King and a red coat that he stated was King's coat, although he explained that King was not wearing it when he saw him that night.

{¶ 23} Darrine Miles testified that he lived in Wilkes Villa from August through October of 2003. He explained that he was friends with King and that on October 26, 2003, he and King hung out together and drank alcohol. He stated that King indicated that he fired his gun earlier that day. Miles explained that King carried the gun most of the time. Miles further stated the King informed him that he tried to steal a light bulb. Miles identified King's red jacket.

{¶ 24} Eventually, according to Miles, he and King walked to Tedman Ct., located in Wilkes Villa. Miles knew that King had a gun with him. Miles and King saw a group of males standing in a corner, walked over, and proceeded to talk to them. The group included "Michi"/Demetruis, Roy Killings, Darius Corlew; and "New York"/Tyrone Francis. According to Miles, everyone talked for about 15 minutes and then Corlew informed King that he felt threatened because King was standing next to him with a gun. King denied threatening Corlew. An argument ensued, and King pulled out his gun and cocked it. Miles stated that Corlew turned around and started walking towards an apartment door and King fired his gun until it was empty. Miles stated that he did not see anyone else with a gun.

2

{¶ 25} Miles explained that he and King fled the scene and went to his aunt's house. They both shed their coats as they ran. The two then obtained a ride to Lorain to Mile's mother's house. King went on without Miles. Miles testified that he had no idea what happened to the gun. He stated that once he talked to his father, he went to the police station.

{¶ 26} On cross examination, Miles confirmed that he had given police conflicting information. He affirmed that there was high drug use at Wilkes Villa, that it was a high-crime area and that many people had guns. He verified that a few weeks before the shooting, King had been robbed at gunpoint. He stated that King was not welcome in Wilkes Villa. Miles informed police that King shot Corlew because he was either drunk or scared that Corlew was going to go get a gun.

{¶ 27} On redirect examination, Miles explained that Corlew was trying to go in the apartment door just before the shooting, and that he had his back to King.

{¶ 28} Jamie Williams, a 13–year–old resident of Wilkes Villa testified that she observed the shooting and identified King as the shooter. She stated that she saw King talking with someone, then pull out a gun and shoot. On cross examination, Williams testified that she saw two people with guns.

{¶ 29} Demetrius Tarrant testified that he was present during the shooting. He explained that he observed King walk up to the group, and watched him load and cock a gun and put it in his waistband. He stated that upon walking up to the group, King shook everyone's hand with the exception of Corlew. He explained that Corlew informed King that he felt threatened by the fact that King was standing near him with a gun. Tarrant testified that Corlew and King had a conversation regarding the gun, during which King stated that if he pulled out the gun, he was going to use it. Corlew told King to leave. Tarrant explained that King then pulled out the gun and opened fire. He explained that he did not see anyone else with a gun. He stated that the shooting occurred as Corlew was trying to go into an apartment and Tyrone Francis was trying to come out of the apartment. He explained that he ran from the scene with Killings.

{¶ 30} On cross examination, Tarrant stated that Corlew and King had had an earlier confrontation about the gun and that there was a lot of tension between Corlew and King. He explained that Corlew was "trying to get to the house, so he wouldn't get shot." He stated that King was the only one with a gun and denied that Killings ditched a gun as they ran from the scene.

{¶ 31} Dr. Paul Matus, the Lorain County Coroner testified that he ruled Corlew and Francis' deaths homicides. He explained that Francis died from a single gunshot wound and that Corlew had been shot four times. He explained that the fatal wounds were the two to Corlew's chest. On cross examination, he verified that both victims

3

tested positive for marijuana, and that they had smoked the drug 5 to 25 minutes prior to the shooting.

{¶ 32} Detective Scott Willis of the Elyria Police Department testified that he processed the scene and located six shell casings outside the apartment. He stated that the bullet casings and shells from both victims were from the same gun. He further testified that he recovered a red jacket about a half mile from the crime scene and it tested positive for gunshot residue.

{¶ 33} Roy Killings testified that at the time of the shooting he lived in Wilkes Villa. He stated that at the time of trial he was in juvenile detention. He explained that on October 26, 2003, after King approached the group of males, Corlew told him to take away the gun. King pulled out the gun and "told [Corlew] to lay down[.]" Corlew tried to run into the apartment while Francis was trying to come out and King shot both. He testified that no one else had a gun that night.

{¶ 34} On cross examination, Killings testified that he was in juvenile detention for trafficking in drugs. He explained that a few weeks before the incident, King hit one of Killings' friends with a beer bottle. As a result, Killings accompanied his friend, along with another friend, to find King and beat him up. Killings denied stealing King's drugs a few days before the shootings. Killings testified that prior to the incident; Corlew told him that if King came up with a gun, he was going to "rush him[.]" Killings testified that King was not welcome in their group and that he was not surprised that King and Corlew had an argument.

{¶ 35} Jerrod Jackson testified that he was currently in prison for assaulting an officer and intimidation, but he was raised in Wilkes Villa. He testified that he observed the incident from across the street. He testified that he observed King approach the group and start shooting his gun. King then ran right past him and Miles ran after him; at one point King turned around and "was about to fire at [Miles]" until Miles said "'It's me, it's me.' " King and Miles continued to run and Jackson went to the apartment and found Corlew on the ground. He stayed at the scene until the police told him to leave.

{¶ 36} On cross examination, Jackson testified that he did not know what happened leading up to the shooting. He explained that he had been with the group prior to King's arrival, and was on his way back when the shooting occurred.

{¶ 37} Sade Charlton testified that at the end of August of 2003, she was King's girlfriend. She stated that on October 26, 2003, a friend told her that King shot Corlew and Francis. She explained that she did not believe the story, so she paged King. King called her back and she asked him if he killed two people. King said no. She then asked if he had "fought" two people and King said yes. Charlton explained

4

that King thought the phones were tapped, so instead of using the word "shoot" he used the word "fight."

{¶ 38} On cross examination, Charlton stated that she knew that King sold drugs at Wilkes Villa and that he was not well liked. She confirmed that when he called her on October 26, 2003, King said, " 'That n[ ] was coming at me crazy, and that's why I shot him.'"

{¶ 39} On re-direct examination, Charlton affirmed that she had told the police at the time of the incident that King told her that "'That n[ ] was talking crazy, so I did what I had to do[.]'" Charlton confirmed her prior statement to the police three times during re-direct examination.

{¶ 40} The State also presented testimony of several police officers who responded to the scene. The parties stipulated to the lab examination regarding gunshot residue and to the BCI report relating to the pellets and shell casings. The State then rested its case. King moved for a Crim.R. 29 motion for acquittal. The trial court granted his motion with regard to the aggravated murder of Francis, but denied it as to the remaining counts.

{¶ 41} King testified on his own behalf. He explained that he a troubled childhood which resulted in incarceration in Nebraska. Upon release from prison, he returned to Wilkes Villa, where he had previously resided. To support himself, he began to sell drugs. King knew Corlew before he went to Nebraska, but upon return to Wilkes Villa, he did not have any direct dealings with him prior to the shooting. He stated that he had problems with other drug dealers in Wilkes Villa because he was taking their customers. He testified that he had previously been robbed at gun point by one of Killings' friends. The man threatened to kill him. The man was later arrested and Killings accused King of being a "snitch."

{¶ 42} King further testified that a few days prior to the shooting incident, he was selling drugs at a local gas station. A group of men wearing masks approached him. He recognized Killings' voice and Demetrius' height, but could not see their faces. King testified that they pulled out their guns and robbed him. They told him that he did not "'deserve to be out here; you don't deserve to be out here.'" As a result of these two incidents King obtained a gun and bullets.

{¶ 43} On October 26, 2003, King testified that he had been at his sister's house. He and Miles were together, drinking and shooting off his gun. The two began to walk to a friend's house. He testified that he was wearing his red jacket, which was previously identified as being found at the scene. He stated that he had his gun in his pocket. Miles and King saw a group of men standing around. He approached the group and attempted to shake everyone's hand, but Corlew would not shake hands. He stated that Corlew "just jumps in my face" saying: "'You think you're hard with

5

that gun, you bitch ass n[ ], you ain't hard.'" The group then surrounded him. King tried to walk away, but Corlew cut him off. King testified that Corlew said "'I feel threatened because you standing right here. You know what I do to mother[ ]? I should kill your bitch ass, you're a bitch, you're a bitch.'" King responded: "'Man, I ain't threaten you, I ain't threaten you, I ain't threaten you.'" Corlew "started pulling for his gun" and King pulled out his and fired as he ran away.

{¶ 44} King testified that he saw Killings with a gun, but that he did not see Corlew with a gun, but he knew that Corlew had one. King testified that he was scared that Corlew was about to kill him. As he ran away, King testified that he removed his coat because he was afraid the men were chasing after him and would recognize the coat. He further testified that he gave the gun to Miles who threw it away. Miles and King obtained a ride to Lorain, where King's grandmother convinced him to turn himself in to the police.

{¶ 45} On cross examination, King confirmed that he violated his parole by selling drugs and carrying a gun. King admitted that he test fired the gun and knew it was operable. King denied any problems with Mason, denying that he ever tried to steal a light bulb. King stated that he was not aiming a gun at Corlew to shoot him. He further confirmed that he chose to approach the group, even though he had recently had troubles with many members of the group.

{¶ 46} On re-direct, King verified that he fired the gun because he feared for his life.

*State v. King*, 2010 WL 3619914, at *4-8 (Ohio Ct. App. Sept. 20, 2010).

### PROCEDURAL BACKGROUND

On November 5, 2003, a Lorain County Grand Jury indicted Petitioner on two counts of aggravated murder, two counts of felony murder, two counts of felonious assault, and one count of improperly discharging a firearm at/into a habitation. (Doc. 29-1, Ex. 1). Each count carried a three-year gun specification. *Id*. Petitioner entered pleas of not guilty to all charges. (Doc. 4-7, at 2).

The case proceeded to jury trial on September 20, 2004. *Id*. at 5. After the state rested its case, Petitioner moved for acquittal. *Id*. The trial court denied Petitioner's motion on all counts except Count Two, the second aggravated murder count with a three-year gun specification. *Id*.

6

On September 23, 2004, the jury found Petitioner guilty of both murder counts with the gun specifications and the felonious assault count with the gun specification. *Id*. at 6. It found him not guilty of the aggravated murder count and gun specification, one of the felonious assault counts and gun specification, and the improperly discharging firearm into habitation count and gun specification. *Id.* The trial court sentenced Petitioner the following day to fifteen years to life imprisonment on the felony murder counts, to be served concurrently, and three years' imprisonment for the felonious assault charge, to be served consecutively to the murder counts. *Id*. The trial court merged the gun specifications into one three-year specification, to be served consecutively to the murder counts. *Id*. (*See also* Doc. 29-1, Ex. 2). The court therefore sentenced Petitioner to a total of twenty-one years' imprisonment.

**<u>Direct Appeal</u>**

Petitioner, through new counsel, filed a timely notice of appeal to the Ninth District Court of Appeals, Lorain County, Ohio. (Doc. 29-1, Ex. 3). In his appellate brief, he raised the following assignments of error:

1.    Appellant's conviction was against the manifest weight of the evidence.

2.    The trial court erred by denying appellant's motion for judgment of acquittal pursuant to Rule 29 of the Ohio Rules of Criminal Procedure.

3.    The trial court abused its discretion when it denied [A]ppellant's motion for a change of venue.

4.    Appellant was denied his right to effective assistance of counsel.

(Doc. 29-1, Ex. 4). The state appellate court affirmed the trial court's judgment on August 17, 2005. (Doc. 29-1, Ex. 6).

King, *pro se*, filed a timely notice of appeal with the Ohio Supreme Court. (Doc. 29-1, Ex. 7). In his memorandum in support of jurisdiction, he restated his four direct appeal assignments of error as four propositions of law. (Doc. 29-1, Ex. 8). On December 28, 2005, the court declined jurisdiction. (Doc. 29-1, Ex. 10).

### First Federal Habeas Corpus Petition

On May 17, 2006, Petitioner filed a *pro se* petition for writ of habeas corpus in this Court before United States District Court Judge Christopher A. Boyko, raising four grounds for relief:

1.   Petitioner's conviction was against the manifest weight of the evidence.

2.   The trial court erred by denying Petitioner's motion for judgment of acquittal pursuant to Rule 29 of the Ohio Rules of Criminal Procedure.

3.   The trial court abused its discretion by denying Petitioner's motion to change venue.

4.   Petitioner was denied his right to effective assistance of counsel.

(*See* Doc. 29-1, Ex. 11, at 178).

In a Report and Recommendation filed December 15, 2006, United States Magistrate Judge Patricia Hemann recommended the petition be dismissed. *Id*. at 172. Judge Boyko adopted the recommendation on February 8, 2007, and denied a certificate of appealability. (Doc. 29-1, Exs. 11, 12). The district court issued its judgment entry on February 9, 2007. (Doc. 29-1, Ex. 13).

Petitioner, *pro se*, attempted to appeal the district court's judgment to the Sixth Circuit Court of Appeals, but on October 12, 2007, the court denied his application for a certificate of appealability. (Doc. 29-1, Ex. 14).

**Resentencing and Subsequent Related State-Court Proceedings**

On August 3, 2009, Petitioner filed in the state trial court a *pro se* motion to vacate or set aside his conviction because it did not include a term of mandatory post-release control, and a *pro se* motion for resentencing on the ground that his original 2004 judgment of conviction was void and not in compliance with Ohio Criminal Rule 32(C). (Doc. 29-1, Exs. 15, 16). The trial court initially denied the motions on August 6, 2009. (Doc. 29-1, Ex. 17). On September 10, 2009, however, the trial court reconsidered, found the original sentence void, and appointed counsel to represent Petitioner for purposes of resentencing. (Doc. 29-1, Ex. 18).

After conducting a *de novo* resentencing hearing, the trial court issued a new "Judgment Entry of Conviction and Sentence" on December 17, 2009, reinstating the underlying convictions and imposing a new sentence. (Doc. 29-1, Ex. 19, at 211-15). However, in addition to imposing the mandatory term of post-release control, which Petitioner sought, the court also changed Petitioner's sentence. This time, it ordered Petitioner's sentences on the murder counts (fifteen years to life imprisonment plus three years for the gun specifications) should run consecutively instead of concurrently, and the felonious assault charge (three years' imprisonment plus three years for the gun specification) should run concurrently to the murder counts instead of consecutively. *Id.* Petitioner's sentence now totaled thirty-three years to life in prison, adding twelve years to his original sentence.

Petitioner, through counsel, filed a timely notice of appeal from the resentencing judgment. (See Doc. 29-1, Ex. 20, at 222). Petitioner presented the following three assignments of error for review in his appellate brief:

1.  Defendant-Appellant's convictions for murder in counts three and four of the indictment must be reversed because both counts omitted a material element of the

offense, in violation of Appellant's constitutional right to a grand jury indictment, and his constitutional right to due process.

2.      The verdicts in this case are against the manifest weight of the evidence.

3.      The trial court violated Defendant-Appellant's right to due process by imposing a harsher sentence after the court granted his motion to vacate his conviction.

(Doc. 29-1, Ex. 21, at 227). On September 20, 2010, the Ohio appellate court affirmed the trial court's judgment. *State v. King*, 2010 WL 3619914, at *9 (Ohio Ct. App. Sep. 20, 2010). (Doc. 29-1, Ex. 23).

On November 30, 2010, Petitioner filed a *pro se* notice of appeal and motion for delayed appeal in the Ohio Supreme Court. (Doc. 29-1, Exs. 24, 25). The state opposed the motion. (Doc. 29-1, Ex. 26). On January 19, 2011, the court denied Petitioner's motion and dismissed the case. (Doc. 29-1, Ex. 27).

On December 17, 2010, Petitioner, through counsel, filed an application to reopen his direct appeal of the 2009 resentencing judgment. (Doc. 29-2, Ex. 28). In his application, Petitioner argued that his appellate counsel was ineffective for failing to raise the following claims:

1.      The trial court committed plain error when it convicted Mr. King of both felonious assault under [Ohio Rev. Code §] 2903.11(A)(l), and murder under [Ohio Rev. Code §] 2903.02(8), as those offenses are allied offenses of similar import. [Ohio R.] Crim.[P.] 52(.B); [Ohio Rev. Code §] 2941.25; *State v; Underwood*, 124 Ohio St.3d 365, 2010-Ohio-l, 922 N.E.2d 923; *State v. Cabrales,* 118 Ohio St. 3d 54, 200R-Ohio-1625, 886 N.E.2d 181; *State v. Williams*, 124 Ohio St .3d 381, 2010-Ohio-147, 922 N.E.2d 937. (December 17, 2009 Judgment Entry of Conviction and Sentence).

2.      The State's misconduct during its closing argument denied Mr. King the right to a fair trial and due process of law, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and Section 16, Article I of the Ohio Constitution. (Trial Transcript, at 510, 516-517, 539-549).

3.      Trial counsel provided ineffective assistance of counsel by failing to object to the State's improper statements during its closing argument. Sixth and Fourteenth

10

Amendments, United States Constitution; Section 10, Article I, Ohio Constitution. (Trial Transcript, at 510, 516-517, 539-549).

*Id*. On April 13, 2011, the state appellate court denied the application. (Doc. 29-2, Ex. 30). It ruled that, under Ohio law, after resentencing, Petitioner was entitled to appeal only those issues related to the resentencing, not the underlying convictions. *Id*. His appellate counsel, therefore, was not ineffective for failing to raise conviction-related claims such as those presented in his reopening application. *Id*.

Petitioner filed a timely *pro se* appeal in the Ohio Supreme Court. (Doc. 29-2, Ex. 31). He presented the following four propositions of law:

1. The [Nin]th [] District Court of Appeals abused its discretion when it denied appellants [*sic*] application for reopening Pursuant to [Ohio R.] App. [P.] 26(B).

2. Appellate counsel was ineffective for not raising the trial court committed plain error when it convicted appellant of both felonious assault under [Ohio Rev. Code §] 2903.11(A)(1) and murder under R.C. 2903.02(B) as those offenses are allied offenses of similar import [Ohio R.] Crim. [P.] 52(B); [Ohio Rev. Code §] 2941.25. On his direct appeal.

3. Appellate [c]ounsel was ineffective for not raising the State's [m]isconduct during it's [*sic*] closing argument. Denied appellant the right to a fair trial and due process of [l]aw in violation of the Fifth Amendment and Fourteenth Amendment to the United States Constitution; Section 16 Article I of the Ohio Constitution. On his direct appeal.

4. Appellate [c]ounsel was ineffective for not raising trial counsel provided ineffective assistance of counsel by failing to object to the State's improper statement during it's [*sic*] closing argument violating appellant's Sixth Amendment and Fourteenth Amendment rights [under] the United States Constitution; Section 10 Article I of the Ohio Constitution. In his direct appeal.

*Id*. at 210. The court declined jurisdiction over the appeal on August 24, 2011. (Doc. 29-2, Ex. 34).

11

**Second Petition for Post-Conviction Relief**

On June 18, 2010, Petitioner filed a second *pro se* petition for post-conviction relief seeking to vacate or set aside his sentence. (Doc. 29-2, Ex. 35). His sole claim was that he had been deprived of the right to confront witnesses at his trial, as there was "no record of these witnesses being questioned or testifying at trial." *Id*. at 240. The trial court denied the petition on June 29, 2010. (Doc. 29-1, Ex. 20, at 223).

A review of the state trial court's online docket reveals that Petitioner did not appeal this judgment. *See* http://cp.onlinedockets.com/loraincp/case_dockets/search.aspx.

## FEDERAL HABEAS CORPUS

Petitioner, *pro se*, filed the instant Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 on August 3, 2012. (Doc. 1). The Petition raises the following seven grounds for relief:

1.  Petitioner's indictment was defective because it failed to properly charge him with the requisite [m]ens [r]ea in counts three (3) and four (4) of his indictment.

2.  Petitioner['s] conviction was against the manifest weight of the evidence.

3.  Petitioner's right to due process of law was violated when trial court imposed harsher sentence after the court granted his motion to vacate conviction.

4.  The [Nin]th [] District Court of Appeals abused it's [*sic*] discretion when it denied [P]etitioner's application for reopening [p]ursuant to [Ohio R.] App. P. 26(B).

5.  Petitioner['s] appellate counsel was ineffective for not raising the trial court committed plain error when it convicted him of both felonious assault under [Ohio Rev. Code §] 2903.11(A)(1) [a]nd [m]urder under [Ohio Rev. Code §] 2903.02(B) as those offenses are allied offenses of similar import.

6.  Petitioner's [a]ppellate [c]ounsel was ineffective for not raising the state's misconduct during its closing argument deny[ing] him the right to a fair trial and due process of law. In his direct appeal.

12

7.  Petitioner['s] appellate counsel was ineffective for not raising trial counsel provided ineffective assistance of counsel, by failing to object to the state's improper statements during it's [*sic*] closing arguments. In his direct appeal.

(Doc. 1-1, at 1, 2, 3, 5; Doc. 1-2, at 2, 3, 4).

Respondent filed an answer on January 19, 2013. (Doc. 4). He argued that Ground Three was procedurally defaulted and Ground Four was noncognizable on federal habeas review. *Id*. at 28-31. Respondent further argued that the Court did not have jurisdiction over the five remaining grounds, because, as they challenged Petitioner's original, undisturbed conviction rather than his new, altered sentence, they were "second and successive" claims barred from federal habeas consideration by 28 U.S.C. § 2244(b).[2] *See id*. at 19-20. Petitioner filed a reply on February 19, 2013. (Doc. 5).

On July 9, 2013, Magistrate Judge Vernelis Armstrong issued a Report and Recommendation recommending the Petition be denied on the grounds advanced by Respondent. (Doc. 6). On August 1, 2013, and August 5, 2013, Petitioner filed objections to the Report and Recommendation. (Docs. 7, 8). On September 26, 2013, the Court adopted the Magistrate Judge's recommendations and dismissed the Petition, without granting a certificate of appealability. (Docs. 9, 10).

Petitioner, *pro se*, filed a timely notice of appeal in the Sixth Circuit. (Doc. 11). The circuit court, on Petitioner's request, granted a certificate of appealability and directed that counsel be appointed to represent him. (Doc. 14). On December 1, 2015, the Sixth Circuit reversed the determination that Petitioner's conviction-related claims were "second or successive," and held that

---

[2] Under the gatekeeping provisions of § 2244(b), claims presented in a "second or successive" habeas application that were previously presented in a federal habeas petition must be dismissed. 28 U.S.C. § 2244(b)(1). Claims in a "second or successive" petition that were not previously presented also must be dismissed unless they rely either on a new and retroactive rule of constitutional law or new facts showing a high probability of actual innocence. 28 U.S.C. § 2244(b)(2).

13

a habeas petitioner may challenge an undisturbed conviction in a second-in-time petition filed after a new sentencing proceeding without triggering the "second or successive" requirements of § 2244(b). *King v. Morgan*, 807 F.3d 154, 160 (6th Cir. 2015). It remanded the case for further consideration of the five grounds dismissed as successive. *Id.*

On December 18, 2015, Petitioner moved for, and was granted, leave to amend his reply. (Docs. 17, 21). He filed the amended reply on February 26, 2016. (Doc. 23). Respondent then moved for, and was granted, leave to amend his answer. (Docs. 24, 27).[3] On April 11, 2016, Respondent filed the amended answer (Doc. 29) with attached exhibits (Docs. 29-1 – 29-4). On May 9, 2016, Petitioner filed a "seconded amended" reply with attached exhibits. (Doc. 30).

The undersigned now addresses the five grounds for relief that previously were dismissed: Grounds One, Two, Five, Six, and Seven.

### JURISDICTIONAL ISSUES

#### Non-Cognizable Claims

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac,* 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due

---

[3] Petitioner objected to the order granting leave to amend the answer, which the Court found not well-taken. (Doc. 28).

process." (citation omitted)). Thus, to the extent Petitioner's claims are based on state-law issues, they are not cognizable on federal habeas review.

*Ground One: Defective Indictment*

Petitioner's first ground for relief alleges that his indictment was defective because it did not specify the underlying offense that formed the basis of the felony murder charges. (Doc. 30, at 14-18). He explains the indictment stated for each count of murder (Doc. 29-1, Ex. 1, at 6-7) that Petitioner "did cause the death of [the victims] as a proximate result of [Petitioner's] committing or attempting to commit an offense of violence that is a felony of the . . . first or second degree and that is not a violation of Section 2903.03 or 2903.04 of the Ohio Revised Code . . . ." (Doc. 30, at 15). But it did not "list[] the statutory name or number of the predicate offenses of violence Petitioner allegedly committed." *Id*. He argues that because of this alleged defect in the indictment, he "believed that if he proved that he did not intentionally cause the death of Mr. Corlew or Mr. Francis at trial, then the jury could have found him guilty of the lesser offense which would have been the felonious assault count . . . ." (Doc. 30, at 16). The undersigned finds this claim is not cognizable on federal habeas review.

It is well settled that there is no federal constitutional right to an indictment in state criminal proceedings. *See, e.g., Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984) (citing *Brazenburg v. Hayes*, 408 U.S. 665 (1972)). Indeed, "the Constitution does not require any particular state indictment rule. In fact, it does not require an indictment at all if sufficient notice of the charges is given in some other manner." *Id*. Fair notice has been given when "the offense [is] described with some precision and certainty so as to apprise the accused of the crime with which he stands charged. Such definiteness and certainty are required as will enable a presumptively innocent man to prepare

for trial." *Id*. "Beyond notice, a claimed deficiency in a state criminal indictment is not cognizable on federal collateral review." *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002) (citing *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir.1986) ("The indictment here had sufficient information to provide petitioner with adequate notice and the opportunity to defend and protect himself against future prosecution for the same offense. Any other deficiencies in the indictment alleged by petitioner are solely matters of state law and so not cognizable in a federal habeas proceeding.")).

Therefore, whether Petitioner's indictment violated Ohio law, as Petitioner argues, has no bearing on the analysis here. As long as "sufficient notice of the charges is given in some . . . manner" so that the accused may adequately prepare a defense, the Fourteenth Amendment's Due Process Clause is satisfied. *Koontz*, 731 F.2d at 369. The indictment here clearly stated the essential elements of the crimes of both murder and felonious assault, with sufficient factual allegations to apprise Petitioner of the charge he faced. (*See* Doc. 29-1, Ex. 1). And Petitioner offers no concrete evidence beyond conclusory and self-serving assertions to show that he truly did not understand the basis for the murder charges against him and the possible predicate offense or offenses of those charges, or that the lack of notice about the predicate offenses undermined his defense in any respect. Thus, the constitutional requirement of fair notice was satisfied. *See Williams v. Haviland*, 467 F.3d 527, 535–36 (6th Cir. 2006) ("Although the exact mens rea requirements were not stated in the indictment, the indictment precisely stated the offenses with which Williams was charged so that there could be no confusion on this point").

Accordingly, Petitioner's first ground for relief is not cognizable on federal habeas review, and the undersigned will not address either the procedural issues raised regarding this claim or its merits.

*Ground Two: Manifest Weight of the Evidence*

In Petitioner's second ground for relief, he contends his murder and felonious-assault convictions were against the manifest weight of the evidence. (Doc. 30, at 18-32). Respondent counters that this claim is not cognizable on federal habeas corpus review. (Doc. 29, at 10, 21-22).

It is true that claims regarding the manifest weight of the evidence are grounded in state law and therefore are generally not cognizable on federal habeas review. *See, e.g., Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983) (Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those convicted without sufficient proof to allow a finding of guilt beyond a reasonable doubt). However, in *Nash v. Eberlin*, 258 F. App'x 761 (6th Cir. 2007), the Sixth Circuit liberally construed a *pro se* habeas petitioner's manifest-weight-of-the-evidence claim to be a sufficiency-of-the-evidence claim. *Id*. at 765 n.4. The court found that Ohio courts had "adequately passed upon" the petitioner's sufficiency claim because the "determination by the Ohio Court of Appeals that the conviction was supported by the manifest weight of the evidence necessarily implies a finding that there was sufficient evidence." *Id*.

Here, Petitioner raised a manifest-weight claim on direct appeal of the 2009 resentencing to both the state appellate court and the Ohio Supreme Court. (*See* Doc. 29-1, Exs. 21, 24). Applying *Nash*, therefore, the undersigned finds that Petitioner effectively presented his sufficiency claim to the Ohio courts through his manifest-weight claim, which the state appellate court adjudicated on the merits. *See King*, 2005 WL 1962967, *1-7.

Thus, the undersigned concludes Petitioner's second ground for relief is a cognizable claim and rejects the argument that it should be dismissed as non-cognizable.[4]

**Procedural Default**

Procedural default occurs when a petitioner fails to fairly present his claims in a federal constitutional context to the highest state court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 839 (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). Federalism and comity generally bar federal habeas corpus review of "contentions of federal law . . . *not* resolved on the merits in the state proceeding due to [the petitioner's] failure to raise them there as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977) (emphasis in original); *see also Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006).

A petitioner may fail to obtain consideration of a claim by a state court by either: (1) failing to fairly raise it before the state court while state remedies are still available, or (2) failing to comply with a state procedural rule which prevents the state court from reaching the merits of the claim. *Wainwright*, 433 U.S. at 80, 84-87. In either scenario, the claim is procedurally defaulted and may not be considered by the federal court on habeas review. *Seymour v. Walker,* 224 F.3d 542, 549-50 (6th Cir. 2000).

---

[4] The undersigned notes that this claim may, however, be procedurally defaulted. Petitioner did not timely appeal the state appellate court's judgment denying it to the Ohio Supreme Court, and that court denied his motion for a delayed appeal. (*See* Doc. 29-1, Exs. 25, 27). As will be explained in greater detail below, this is grounds for procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004) (per curiam). Respondent does not raise this defense, however, and the undersigned will not engage in this analysis because it finds the claim meritless. *See* 28 U.S.C. § 2254(b)(2) (courts may deny unexhausted habeas petitions on the merits); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily resolvable against the habeas petitioner").

18

When there is noncompliance with a state procedural rule, the court conducts a four-step analysis to determine whether the petitioner has indeed defaulted and, if so, whether the default may be excused:

1.   Whether there is a procedural rule applicable to the claim at issue, and whether the petitioner in fact failed to follow it;

2.   Whether the state courts actually enforced their procedural sanction;

3.   Whether the state's procedural forfeit is an "adequate and independent ground" on which the state can rely to foreclose federal review; and

4.   Finally, in order to avoid default, the petitioner can demonstrate that there was "cause" for him to neglect the procedural rule, and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Demonstrating "cause" requires a petitioner to "show that 'some objective factor external to the defense' prevented the petitioner's compliance with a state procedural rule." *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Demonstrating prejudice requires him to show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

A procedural default will also be excused if the petitioner demonstrates that not excusing the default "will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). The Supreme Court has held that such an inquiry requires a petitioner "supplement[] his constitutional claim with a colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986). Maintaining this exception to the rule against reviewing procedurally

19

defaulted claims serves as "an additional safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty." *Stone v. Powell*, 428 U.S. 465, 492-93, n.31 (1976).

*Grounds Five, Six, and Seven: Ineffective Assistance of Appellate Counsel*

Petitioner's fifth through seventh grounds for relief allege he was denied his Sixth Amendment right to the effective assistance of appellate counsel. Specifically, Petitioner claims that appellate counsel should have raised the following claims on direct appeal:

1.    The trial court erred by convicting him of both felony murder and felonious assault, which are allied offenses of similar import.

2.     The prosecution committed misconduct during closing argument.

3.    Trial counsel was ineffective for failing to object to the prosecutor's improper statements during closing argument.

(Doc. 30, at 34, 40, 41).

Petitioner raised these claims in the state court of appeals in a Rule 26(B) application to reopen his direct appeal of the 2009 resentencing. (Doc. 29-2, Ex. 28). The appellate court denied the application. (Doc. 29-2, Ex. 30). It ruled that, under the Ohio Supreme Court case *State v. Fischer*, 128 Ohio St. 3d 332 (Ohio 2010), after resentencing, Petitioner was entitled to appeal only those issues related to the resentencing, not the underlying convictions. *Id*. His appellate counsel, therefore, was not ineffective for failing to raise conviction-related claims such as those presented in his reopening application. *Id*. Petitioner appealed the appellate court's judgment to the Ohio Supreme Court, which declined jurisdiction. (Doc. 29-2, Exs. 31, 34).

Respondent notes that the Sixth Circuit, in reviewing Petitioner's first federal habeas petition, found the record demonstrated that Petitioner was not given a limited resentencing, but a *de novo* resentencing, and the state appellate court's analysis therefore "was arguably flawed." (Doc.

20

29, at 22). He continues that regardless of the state court's reasoning, the court adjudicated the claims on the merits and that decision is therefore entitled to AEDPA deference under *Harrington v. Richter*, 562 U.S. 86 (2011). *Id.*

As Petitioner points out (Doc. 30, at 34), however, Respondent incorrectly assumes that the state appellate court's decision was an "adjudication on the merits." The *Fischer* decision was premised on the procedural rule of *res judicata*, holding that "[a]lthough the doctrine of res judicata does not preclude review of a void sentence, res judicata still applies to other aspects of the merits of a conviction, including the determination of guilt and the lawful elements of the ensuing sentence." *Fischer*, 128 Ohio St. 3d 92, paragraph three of the syllabus. Indeed, the appellate court stated that "[t]he unique procedural stance of this case along with the . . . recent decision in [*Fischer*] compels us to deny the application for reopening." (Doc. 29-2, Ex. 30, at 204). Because the state appellate court, the last state court to address this claim, imposed the procedural bar of *res judicata* to the claims Petitioner raised in his reopening application, and did not adjudicate them on their merits, the claims are procedurally defaulted. *See, e.g., Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007) (holding that the *res judicata* doctrine is an adequate and independent state ground to procedurally bar claims asserted in federal habeas actions).

Petitioner counters that the Sixth Circuit's decision and remand "negated the Respondent's claims that Petitioner's grounds were barred from review by the State courts, as he was entitled to a successive appeal on the issues following a resentencing." (Doc. 30, at 7). But he presents no authority for the proposition that an appellate court's remand of a federal habeas case to the district court for consideration of certain claims somehow cures a petitioner's procedural default of the remanded claims, and the undersigned can find none. Moreover, Petitioner does not offer any

argument regarding either the cause for, or prejudice resulting from, his procedural default of this claim.

However, liberally construing Petitioner's final reply, Petitioner does contend (albeit with respect to the procedural default of a different claim), that he is actually innocent such that a default should be excused. (Doc. 30, at 11-12, 14). The "actual innocence," or "fundamental miscarriage of justice," exception to the cause and prejudice requirement for overcoming procedural default applies only where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004). To demonstrate "actual innocence," a petitioner must show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner [guilty] under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)). The claim requires a showing of "new reliable evidence" and factual innocence, not mere legal insufficiency. *See Schlup v. Delo*, 513 U.S. 298, 324 (1995); *Bousley v. United States*, 523 U.S. 614, 623 (1998). Petitioner has made no such showing. He argues that "[b]ecause [his] [d]ue [p]rocess [r]ights were violated, and [he] asserts he is actual innocence [*sic*] of the charges against him, [he] therefore [makes] an arguable claim of factual innocence under self-defense . . . ." (Doc. 30, at 11). But this argument is circular; Petitioner presents no new evidence whatsoever to prove self-defense. Therefore, his actual innocence claim fails.

Accordingly, the undersigned recommends the Court dismiss Petitioner's fifth, sixth, and

22

seventh grounds for relief.[5]

_____

[5] Even if the claims in Petitioner's reopening application were preserved for federal habeas review, they would fail. In Ground Five, Petitioner asserts that appellate counsel was ineffective for failing to raise the issue that his convictions of felony murder and felonious assault were allied offenses of similar import in violation of the Double Jeopardy Clause. (Doc. 30, at 34-40). Even if Petitioner is correct that the two offenses are allied offenses, the trial court did not err, because it did not impose two separate and cumulative sentences for the charges; it made the sentences concurrent, rather than consecutive. "The Double Jeopardy Clause protects against a second prosecution for the same offense after acquittal . . . [and] after conviction. And it protects against multiple punishments for the same offense.'" *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (internal quotation marks and citations omitted). Only the multiple-punishments prohibition could apply here. And that protection applies only "when the state legislature does not intend for the punishments to be cumulative." *Volpe v. Trim*, 708 F.3d 688, 696 (6th Cir. 2013) (citing *Albernaz v. United States*, 450 U.S. 333, 334 (1981)). "When two different statutory provisions authorize punishment for the same act, '[t]he first step is to determine whether [the legislature] intended to punish cumulatively the same conduct which violates two statutes.'" *Id*. (quoting *United States v. Johnson*, 22 F.3d 106, 107-08 (6th Cir. 1994)).

In Ohio, to determine the legislature's intent regarding allied offenses, courts apply Ohio Rev. Code § 2941.25 (Ohio's multiple counts statute). *Id.* at 697. And "'[w]hen assessing the intent of a state legislature, a federal court is bound by a state court's construction of that state's own statutes.'" *Id.* (quoting *Banner v. Davis*, 886 F.2d 777, 780 (6th Cir. 1989)). In *State v. Whitfield*, 124 Ohio St. 3d 319 (2010), the Ohio Supreme Court explained that § 2941.25(A) codifies the judicial doctrine of merger, which operates to merge allied offenses of similar import into a single conviction. *Id*. at 322. While a defendant may be indicted and tried for allied offenses of similar import, it observed, the defendant may be sentenced on only one of the allied offenses. *Id*. at 323. Thus, "[i]n cases in which the imposition of multiple punishments is at issue, R.C. 2941.25(A)'s mandate that a defendant may be 'convicted' of only one allied offense is a protection against multiple sentences rather than multiple convictions." *Id*. (citing *Ohio v. Johnson*, 467 U.S. 493, 498 (1984)). Therefore, even assuming Petitioner is correct that the two offenses are allied, the trial court did not commit constitutional error when it convicted Petitioner of both felony murder and felonious assault but imposed concurrent sentences for those offenses. It follows that appellate counsel was not deficient for failing to raise this issue, nor was Petitioner prejudiced by counsel's failure to do so. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (applying two-part test for ineffective-assistance claims established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), requiring deficient performance and prejudice).

In Ground Six, Petitioner complains that appellate counsel should have raised a claim alleging the prosecutor made improper statements during closing argument. Namely, Petitioner contends the prosecutor engaged in misconduct by stating that Petitioner was a drug dealer and "career criminal" and was "not going to dirty up his own city, the city of Lorain, he's going to come to us here in Elyria[,]" which allegedly appealed to the jury's class prejudices; and by attacking Petitioner's testimony as a "lie[,]" "nonsense[,]" and "garbage[.]" (Doc. 30, at 41-47). To prevail on a habeas claim of prosecutorial misconduct, "it is not enough that the prosecutors' remarks were

**STANDARD OF REVIEW**

When the basis for a federal habeas claim has been previously adjudicated by the state courts, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides the writ shall not issue unless the state decision "was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A federal court may grant habeas relief if the state court arrives at a decision opposite to that reached by the Supreme Court of the United States on a question of law, or if the state court decides a case differently than did the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

---

undesirable or even universally condemned"; rather, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)) (internal quotation marks and citation omitted). "Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 11 (1985). "The prosecution necessarily has 'wide latitude' during closing argument to respond to the defense's strategies, evidence and arguments." *Wogenstahl v. Mitchell*, 668 F.3d 307, 329 (6th Cir. 2012) (quoting *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009)). Indeed, "a prosecutor may assert that a defendant is lying during her closing argument when emphasizing discrepancies between the evidence and that defendant's testimony." *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999). The undersigned has examined the complained-of comments in the context of the entire trial and finds the comments were not improper given Petitioner's admission that he sold drugs and the strength of the evidence contradicting Petitioner's testimony. Appellate counsel, therefore, was not ineffective for not raising this claim. Nor was he ineffective for failing to raise a claim that trial counsel was ineffective for failing to object to these comments, as alleged in Petitioner's Ground Seven. (Doc. 30, at 47-49).

The appropriate measure of whether or not a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Williams*, 529 U.S. at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87 (2011).

State trial court factual determinations are presumed correct and a petitioner must present clear and convincing evidence to the contrary in order to overcome the correctness presumption. 28 U.S.C. § 2254(e). "It is a clearly established rule that errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in federal habeas corpus proceedings." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988).

### DISCUSSION

### Ground Two: Manifest Weight of the Evidence / Sufficiency of the Evidence

The Due Process Clause of the Fourteenth Amendment requires a state to prove every element of a crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979). A habeas court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319 (emphasis in original). "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993).

Because both *Jackson* and AEDPA apply to Petitioner's sufficiency claim, federal habeas review requires deference at two levels. "'First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by [the] AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). The Sixth Circuit has observed that "'[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Id.* at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

As explained above, Petitioner presented a claim that his convictions were against the manifest weight of the evidence on direct appeal in state court. After reviewing the evidence adduced at trial, the state appellate court, the last state court to address the claim, opined:

> {¶ 47} Upon examination of the testimony, this Court cannot say that the jury clearly lost its way when it convicted King of felonious assault and murder. The State presented several eyewitnesses to the shooting, all of which denied that Corlew had a gun and indicated that King's actions were unprovoked. As we have recently explained, "'The jury did not lose its way simply because it chose to believe the State's version of the events, which it had a right to do.'" *State v. Feliciano*, 9th Dist. No. 09CA009595, 2010–Ohio–2809, at ¶ 50, quoting, *State v. Morten*, 2d Dist. No. 23103, 2010–Ohio–117, at ¶ 28.

*King*, 2010 WL 3619914, at *8.

Petitioner argues that the state court's decision was unreasonable because it "did not properly consider" certain testimony and evidence. (Doc. 30, at 23). He claims he met his burden at trial of proving the affirmative defense that he acted in self-defense, explaining:

> It is clear from the testimony of credible witnesses, which includes Petitioner's testimony, and the forensic evidence from the scene of the altercation that he was not at fault in creating that situation, as he was in the area because he was visiting his sister who lived there,  and that he fired his gun only because he was in fear of his life. . . . The evidence clearly shows that Petitioner could not possibly have been

standing still trying to kill anyone, but that he fired his gun while retreating for self-protection to get away from Mr. Corlew and his gang unharmed.

(Doc. 30, at 32). On the other hand, he argues, the state's case "was based solely on the credibility of the state's witnesses who testified they believed Petitioner was not threatened nor justified to use deadly force[,]" and those witnesses "were without credibility, conflicting, biased, self-serving, and/or perjured by or through their own admission or . . . physical evidence." (Doc. 30, at 23). "[H]ad these testimonies been corrected at trial and all evidence been clearly presented," he posits, "there is reason to believe that the jury's conclusion would have been different and the jury would not have found him guilty beyond a reasonable doubt." *Id*. Petitioner provides a detailed discussion of the witnesses' testimony and their respective strengths or weaknesses. (Doc. 30, at 23-32).

Petitioner, however, has not met his burden under *Jackson*. First, *Jackson* instructs habeas courts to review the testimony and physical evidence on the record, as it was adduced at trial, not as it could or should have been presented according to the petitioner; Petitioner relies heavily on speculation. Second, the state court correctly explained that "[t]he jury did not lose its way simply because it chose to believe the State's version of the events, which it had a right to do." *King*, 2010 WL 3619914, at *8 (internal quotation marks and citation omitted). Indeed, the Supreme Court has emphasized that, "under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of [habeas] review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The *Jackson* Court itself was clear that it is the "responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts. . . . The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson*, 443 U.S. at 319. Finally, Petitioner appears to be relitigating his case, presenting his "clear" and "reasonable" "explanation" of the evidence. (*See, e.g.*, Doc. 30, at

27

31). But the issue under *Jackson* is different. It asks whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319 (emphasis in original). It does not ask "whether the trier of fact made the correct guilt or innocence determination . . . ." *Herrera*, 506 U.S. at 402. Here, based on the evidence presented, a rational trier of fact clearly could have found the state proved beyond a reasonable doubt every element of the crimes for which Petitioner was convicted.

Thus, the state appellate court's decision was neither contrary to, nor an unreasonable application of, *Jackson*, and the undersigned recommends that the Court dismiss Petitioner's second ground for relief.

## CONCLUSION AND RECOMMENDATION

Ground One is non-cognizable on federal habeas review. Ground Two fails on the merits. Grounds Five through Seven are procedurally defaulted. There has been no demonstrated need for an evidentiary hearing. Finally, Petitioner has not established any error resulting in a denial of fundamental fairness or cause to hesitate due to the probability of actual innocence. The undersigned therefore recommends the Petition (Doc. 1) be denied and dismissed in its entirety.

s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).